Filed 3/30/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| AKIRA KOKUBU,<br><br>    Plaintiff, Cross-defendant and Respondent,<br><br>    v.<br><br>TAKASHI SUDO et al.,<br><br>    Defendants, Cross-defendants and Respondents;<br><br>PARK ROLLING HILLS, LLC, et al.,<br><br>    Defendants, Cross-complainants and Appellants. | B310220<br><br>(Los Angeles County<br>Super. Ct. No. 18STCV04896) |

    APPEAL from an order of the Superior Court of Los Angeles County. Daniel S. Murphy, Judge. Affirmed.

    Baker, Burton & Lundy, Albro Lundy and Evan R. Koch, for Defendants, Cross-complainants, Cross-defendants and Appellants.

    Chassman & Seelig, and Mark B. Chassman for Plaintiff, Cross-defendant and Respondent.

    Leago Law Group, and Gina A. Leago, for Defendants, Cross-complainants, Cross-defendants and Respondents.

————————————————

## INTRODUCTION

This appeal arises out of a dispute between several investors, whose best-laid plans to exploit a Japanese tax incentive promoting wood frame construction has left them fighting about their respective rights in a decades-old office complex in Los Angeles County.

Appellants[1] were some of the defendants below. Respondents[2] include three other defendants, plus the plaintiff (Kokubu).

Appellants seek reversal of the trial court's order denying their motion to compel arbitration, which they filed more than two years after the lawsuit began. The trial court denied the motion on the basis that Appellants had waived their right to arbitrate by unreasonably delaying their motion, taking actions inconsistent with the right to arbitrate, and depriving Respondents the benefits of arbitration. It also found that the third-party arbitration exception applied, independently warranting denial of the motion. Appellants contend, in relevant part, that: (1) waiver may be found only where the non-movant is prejudiced; (2) the type of prejudice Respondents suffered is

---

[1]    The appellants are Beach Front Properties, LLC (BFP); Daniel J. Niemann, Inc.; NPI Beach Front Ventures, LLC; and Park Rolling Hills LLC (collectively, Appellants). Appellants are defendants, cross-complainants, and cross-defendants below.

[2]    The respondents are Akira Kokubu (Kokubu); Takashi Sudo (Sudo); Tomoko Hamamoto (Hamamoto); and Japan Investments LLC (JI) (collectively, Respondents). Kokubu is the plaintiff and a cross-defendant below. Sudo, Hamamoto, and JI are defendants, cross-complainants, and cross-defendants below.

inadequate as a matter of law; and (3) Appellants did not act unreasonably or in a manner inconsistent with the right to arbitrate in delaying their motion to compel. We disagree and affirm.[3]

## BACKGROUND

Respondents (who the parties refer to as the "Japanese Investors") and two of the Appellants (who the parties refer to, with certain of their affiliates, as the "US Investors") purchased the property in 2006.[4] The purchase was financed, in part, by a $4 million commercial loan secured by a deed of trust. The grant deed reflected ownership by the Respondents, in the aggregate, of 99.01 percent, with Appellants holding the remaining 0.99 percent. A tenancy-in-common agreement (TIC 1) and master lease agreement (MLA 1) entered into at closing afforded the various owners proportionate economic interests that differed from their respective record title shares. The differences between their proportionate economic and title shares were the product of the parties' efforts to maximize the tax benefits to the Japanese investors.

Two years after buying it, Appellants and Respondents refinanced the property with a new $4 million loan from JPMorgan Chase Bank, N.A. (JP Morgan). In connection with

---

[3]    Undesignated statutory references are to the Code of Civil Procedure.

[4]    To avoid needless and confusing detail, we refer to these groups simply as Appellants and Respondents. We do so even when referring to fewer than all Appellants or Respondents or to Appellants together with one or more of their affiliates, except where further distinction is relevant to our analysis.

3

the refinance, Respondents contend that they and Appellants entered into a new tenancy-in-common agreement (TIC 2) and a new master lease agreement (MLA 2). Appellants contend that their signatures on those documents are fraudulent.

The dispute over whether the TIC 1 or TIC 2 was operative arose in 2018 in connection with discussions over the sale or refinancing of the property. Appellants maintained that the TIC 1, which entitled them to 49.01 percent of any net sale proceeds, continued to govern, whereas Respondents took the position that the TIC 2 controlled, which would afford Appellants just 0.99 percent of any net sale proceeds.

The economic interests remained unresolved as of the scheduled maturity of the JP Morgan loan. As a result, the Respondents and Appellants defaulted on the loan. JP Morgan issued a notice of default in November 2018 and the Respondents and Appellants failed to cure.

Immediately after the November 2018 default, Respondent Kokubu (the original plaintiff) filed a complaint against Appellants, the other Respondents, and JP Morgan for partition by sale, thereby commencing the action below. Two months later, Kokubu recorded a notice of lis pendens against the property.

In January 2019, Appellants filed a demurrer to Kokubu's complaint. Kokubu filed a first amended complaint in April expanding on his allegations to support the sole partition count. This prompted Appellants to withdraw their demurrer in April and then answer in May. In their answer, Appellants asserted a right to arbitration as an affirmative defense.

In June of 2019, the trustee under the JP Morgan deed of trust noticed a foreclosure sale for the following month. Though the urgency of the threatened sale prompted further discussions

4

between the two sides, they failed to reach an accord.

Just six days before the scheduled trustee's sale, Appellants filed a cross-complaint against Respondents for fraud, breach of contract, concealment, constructive trust, and injunctive relief. They also cross-complained against JP Morgan only for injunctive relief to enjoin the foreclosure sale.

The same day as they filed their cross-complaint, Appellants made a demand for arbitration on Respondents under section 33 of the MLA 1. Appellants contend that they simultaneously sought a stay of the proceedings to permit arbitration. However, this assertion is not supported by the record. Four days after filing their cross-complaint, Appellants filed an ex parte application to enjoin *the trustee's sale* for one-hundred and fifty days, explaining that such postponement would "permit the parties to resolve the underlying via arbitration." We find no indication in the record that Appellants sought to stay the court proceedings *en toto* in order to permit arbitration.

The trial court declined to enjoin the trustee's sale but directed the trustee to hold any net proceeds in a blocked account. The sale went forward on July 25, 2019, and Appellant BFP purchased the property for a penny more than the amount necessary to discharge JP Morgan's lien.

When Respondents learned of the result of the trustee's sale, they demanded that Appellant BFP acknowledge their rights in the property. BFP ignored them. On August 2, 2019, Respondents sought an ex parte order prohibiting BFP from transferring the property. However, by the time the matter was heard, BFP had already transferred the property to an affiliate.

On August 6, 2019, Appellants filed a case management statement in the trial court on mandatory form CM-110. Among other things, they demanded a jury trial for their fraud cross-claim, estimated that trial would take seven to ten days, proposed discovery cutoff dates, and provided attorney availability for trial. In section 10.c, where instructed to indicate the ADR processes they were "willing to participate in" or "have agreed to participate in," Appellants checked "Mediation" and "Settlement conference" but *not* "Binding private arbitration." Appellants did separately note that they had "demanded arbitration pursuant to the terms of the [MLA 1]." Later that day, however, Appellants withdrew their demand for arbitration via email to counsel for the Respondents.

The following day, Respondents Sudo, Hamamoto, and JI filed a cross-complaint against Appellants and certain of their affiliates asserting claims including breach of fiduciary duty, fraud, and breach of contract. Also, Sudo, Hamamoto, JI, and certain non-parties filed, and then withdrew, a lis pendens against the property, which Sudo and Hamamoto subsequently refiled.

From the time Appellants withdrew their arbitration demand in August of 2019 until December of 2020, the litigation proceeded without any outward indication that Appellants intended to arbitrate. Indeed, when they filed their October 2019 case management statement, they maintained their jury trial requests, discovery schedule proposals, and non-arbitration ADR preferences from their August 2019 statement, but dropped any reference to their demand to arbitrate. In the intervening months, Appellants refined their pleadings, answered pleadings, sought relief, opposed relief, responded to discovery, and served

6

(and sought to compel responses to) their own discovery demands. Included in this litigation activity were three separate motions to expunge the lis pendens against the property, the first of which was filed on August 23, 2019, and the last of which was granted (subject to a bond condition Appellants declined to fulfill) on June 24, 2020.

Shortly after the order on the lis pendens, in July 2020, Respondent Kokubu filed a motion for summary adjudication (MSA) of his fraudulent conveyance and partition counts and set the hearing for November 2020. Appellants responded with document requests and deposition notices for mid-August and early September, specifying that the depositions would be taken remotely. The day before the depositions were set to begin, Appellants took them off calendar, explaining that they needed in-person depositions (despite their earlier contrary position) and expressed hope that they could be completed "at some point next year." Weeks after their depositions were originally scheduled to have been completed, Appellants moved ex parte to continue the hearing on the MSA, as well as the trial date, to permit in-person depositions. The court granted the motion and moved the MSA hearing to January 2021 and the trial to July 2021.

At the end of October, Appellants served new notices for depositions in November and December 2020. Ultimately, the first of these was scheduled to go forward on December 9, 2020. However, on December 7, 2020, Appellants filed their motion to compel arbitration and related motion to stay the proceedings. The following day, Appellants again unilaterally took the depositions off calendar the day before the first was set to go forward.

On January 8, 2021, the trial court denied the motion to compel arbitration. Its decision rested on two grounds. First, it concluded that Appellants had waived the right to arbitration pursuant to section 1281.2, subdivision (a). Second, it found that the third-party litigation exception in subdivision (c) applied.

This appeal followed, resulting in a stay of the proceedings below pursuant to section 916, subdivision (a). On appeal Respondents requested expedited consideration pursuant to section 1291.2 and the court's inherent authority, which Appellants opposed in part. We granted calendar preference.

## DISCUSSION

### I. Standard of Review

On appeal, a trial court's order enjoys the presumption of correctness. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Even if the record reflects that the trial court misunderstood or misapplied the law in reaching its conclusion, it will be affirmed if supported by any legal theory. (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 980–981.)

" 'Generally, the determination of waiver is a question of fact, and the trial court's finding, if supported by sufficient evidence, is binding on the appellate court. [Citations.] "When, however, the facts are undisputed and only one inference may reasonably be drawn, the issue is one of law and the reviewing court is not bound by the trial court's ruling." ' [Citation.]" (*Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 375 (*Iskanian*).) When the substantial evidence test applies, a court cannot draw inferences based on "mere speculation or conjecture," but only from evidence that is " 'reasonable . . . , credible, and of solid value.' " (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627,

8

1633.)  The appellate court may not reverse the trial court's finding of waiver unless the record as a matter of law compels finding nonwaiver.  (*Burton v. Cruise* (2010) 190 Cal.App.4th 939, 946 (*Burton*).)

## II.  Arbitrability of the Instant Dispute

The TIC 1 and MLA 1 each contain arbitration provisions, but they are not the same.  As the parties note, the provision in TIC 1 covers only disputes relating to the exercise of a "Buy Sell Option" whereas the disputes covered by the MLA 1 provision reach claims between the "Lessors and the Lessee,"[5] which "aris[e] under or in connection with" MLA 1.  In asserting their arbitration rights, Appellants do not claim that any "Buy Sell Option" dispute is implicated.  Respondents do not dispute that Appellants had arbitration rights before waiving them, but assert that such rights could only arise under the MLA 1 (and not under the TIC 1).  Appellants offer no rebuttal to this assertion.  On this basis, we accept that the MLA 1 contains the operative arbitration provision which would extend to the underlying dispute in the absence of a waiver.

## III.  The Framework for Determining When a Party Has Waived Its Contractual Right to Arbitrate Is Firmly Established

At the core of this appeal is a request by Appellants that we declare new rules for, and place new limits on, when a party may be found to have waived its contractual rights to arbitrate.  Though they vacillate between describing the law in descriptive and normative terms, Appellants tacitly concede that they are

---

[5]     The "Lessors and Lessees" include Appellants and Respondents.

9

advocating for a novel interpretation of California law that would revive their arbitration rights as a matter of law. Specifically, they ask that we "clarify the case law" to permit a finding of waiver *only* where (1) "the party seeking arbitration *unreasonably* delays in seeking to compel it by motion or petition," *and* (ii) "the party opposing arbitration has been *prejudiced* by moving [*sic*] party's actions or delay." Appellants ask us to further "clarify" that, "[i]n this context *prejudice* specifically requires either 'judicial litigation of the merits of arbitrable issues' or a substantial alteration in the party's litigation position."

We must disagree with Appellants that their proposed "clarifications" represent "a fair and constrained reading of the case law." Standards that have been repeatedly reaffirmed by our Supreme Court give trial courts considerable flexibility to determine when waiver occurs. We have no authority to deviate from these rules. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) As explained in *St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187 (*St. Agnes*), "no single test delineates the nature of the conduct that will constitute a waiver of arbitration." (*Id.* at p. 1195.) Rather, given the " ' "variety of contexts" ' " in which waiver may be found (*id.* at p. 1196), the following six factors (the *St. Agnes* factors) are relevant to determining whether waiver has occurred:

> " ' "(1) whether the party's actions are inconsistent
> with the right to arbitrate; (2) whether 'the litigation
> machinery has been substantially invoked' and the
> parties 'were well into preparation of a lawsuit'
> before the party notified the opposing party of an
> intent to arbitrate; (3) whether a party either
> requested arbitration enforcement close to the trial

10

date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) 'whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place'; and (6) whether the delay 'affected, misled, or prejudiced' the opposing party." ' " (*St. Agnes, supra,* 31 Cal.4th at p. 1196; see also *Wagner Construction Co. v. Pacific Mechanical Corp.* (2007) 41 Cal.4th 19, 30-31 [same]; *Iskanian, supra,* 59 Cal.4th at p. 375 [same].)

To the extent Appellants ask us to pronounce that the *St. Agnes* factors have collapsed into or must turn upon a single "prejudice" factor, we decline to do so.  Courts have made clear that no one factor is predominant.  (*Burton, supra,* 190 Cal.App.4th at pp. 944–945.)  But it is fair to say that virtually every case that has found there to be a waiver of arbitration has cited to the existence of "prejudice" as one of the factors present. *St. Agnes* referred to prejudice as a "critical" factor under California law, and subsequent cases have found that "although prejudice has been held to be 'critical' in determining waiver, we also note the Supreme Court has cautioned courts to examine each case in context:  'no single test delineates the nature of the conduct that will constitute a waiver of arbitration.'  [Citation]." (*Fleming Distribution Co. v. Younan* (2020) 49 Cal.App.5th 73, 84 (*Younan*); see also *Law Offices of Dixon R. Howell v. Valley* (2005) 129 Cal.App.4th 1076, 1097 ["While no single [*St. Agnes*] factor is determinative, it is nonetheless true that '[i]n California, whether or not litigation results in prejudice is also critical in waiver determinations.  [Citations.]' "].)  We have previously reached a similar conclusion in the context of a federal arbitration.

11

(*Khalatian v. Prime Time Shuttle, Inc.* (2015) 237 Cal.App.4th 651, 654–655.)

We disagree with Appellants' argument that a more circumscribed test for when waiver occurs would necessarily promote California's policy favoring arbitration. Arbitration is favored because it allows parties to elect "a speedy and relatively inexpensive means of dispute resolution" (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 322), and provides some relief for crowded court dockets (*Zakarian v. Bekov* (2002) 98 Cal.App.4th 316, 325). The breadth of circumstances in which waiver may be found encourages a party with the right to force arbitration to assert it promptly. Time, expense, and scarce judicial resources are all preserved by such an incentive, in furtherance of the interests underlying the policy favoring arbitration. Appellants' proposed test that would preclude waiver as a matter of law even with respect to a case like this one, that has remained in court for years before arbitration is sought, is counter to this policy.

Likewise, we do not share Appellants' concerns that the flexibility of the *St. Agnes* analysis affords trial courts too much discretion in determining whether waiver has occurred. Trial courts are uniquely positioned to evaluate the conduct of litigants before them within the broader context of a case. Given that the *St. Agnes* factors are largely concerned with such conduct, the deference we give to the trial courts' factual determinations is especially warranted in the context of alleged arbitration waiver.

We now turn to whether the record below supports the trial court's finding of waiver.

## IV.  The *St. Agnes* Analysis

For the reasons that follow, we find substantial evidence supports the trial court's finding of waiver under the *St. Agnes* factors.

### A.  Appellants Took Actions Inconsistent With the Right to Arbitrate

Substantial evidence supports the trial court's conclusion that Appellants acted in a manner that was inconsistent with an intent to arbitrate.  Appellants were sued in November 2018 but did not demand arbitration until July 19, 2019.  At the same time as they made their initial demand, Appellants filed a cross-complaint without seeking a stay of the case.  Shortly thereafter, following the trustee's sale, they withdrew their arbitration demand and removed reference to the right to arbitration in subsequent case management statements.  Until filing their motion to compel in December 2020, Appellants proceeded in the same manner as a party without any right to arbitrate, participating in case management conferences, filing motions, seeking ex parte relief, and seeking and participating in discovery.

Appellants' efforts to reconcile their conduct with a sincere and continuous intent to arbitrate are unavailing.  They say they withdrew their July 2019 arbitration demand following the trustee's sale "simply [to] reflect[] th[e] reality [that] there was nothing to arbitrate because there was no longer any valid outstanding claim."  This assertion is contrary to the record.  No claims were dismissed as a result of the foreclosure.  Indeed, Respondent Kokubu's partition claim currently remains pending in the trial court, as do most of Appellants' claims asserted the day they made their arbitration demand.  These are among the

13

same claims that Appellants now seek to arbitrate.

Further, Appellants say they wanted to remain before the trial court solely to expunge the lis pendens because of uncertainty over whether they could accomplish expungement through arbitration. However, this cannot be squared with either Appellants' demand for arbitration in July 2019 while the Kokubu lis pendens had been on record for more than six months, or with Appellants' five-month delay in seeking to compel arbitration *after* their lis pendens motion was resolved.

Moreover, Appellants' contention that they secretly intended to avail themselves of rights unique to the court before seeking to compel arbitration violates the adage that " '[t]he courtroom may not be used as a convenient vestibule to the arbitration hall so as to allow a party to create his own unique structure combining litigation and arbitration.' " (*Christensen v. Dewor Developments* (1983) 33 Cal.3d 778, 784 (*Christensen*).) Courts routinely find such behavior inconsistent with the right to arbitrate. (See, e.g., *Sprunk v. Prisma LLC* (2017) 14 Cal.App.5th 785, 798 ["An attempt to gain a strategic advantage through litigation in court before seeking to compel arbitration is a paradigm of conduct that is inconsistent with the right to arbitrate"].)

Had Appellants wished to avoid claims of waiver after litigating expungement they should have made their intentions known instead of withdrawing their arbitration demand in writing and thereafter going silent on the topic (including in case management statements where disclosure of the right is mandatory). Section 1298.5 provides that a person does not waive their right to arbitrate by *filing* a lis pendens in court so long as they simultaneously seek to stay the action pending

14

arbitration. While this provision did not directly apply to Appellants in seeking *expungement* of a lis pendens, it does demonstrate they could have easily disclosed to the trial court and counsel an ongoing intent to arbitrate notwithstanding their apparent acquiescence to the judicial forum.

Finally, the trial court properly considered Appellants' discovery activities in considering whether their actions were inconsistent with a right to arbitrate. Appellants' arguments that they gained nothing from these activities do not change the fact that they were inconsistent with an intent to arbitrate. The MLA 1's arbitration provision denies them any right to discovery outside of "the exchange of any exhibits that the Parties propose to use at the arbitration hearing." By seeking to obtain information prohibited to them in arbitration, Appellants' conduct was consistent with seeking to resolve their disputes in the trial court and not in arbitration. (See, e.g., *Adolph v. Coastal Auto Sales, Inc*. (2010) 184 Cal.App.4th 1443, 1451 (*Adolph*) [defendant's actions found inconsistent with right to arbitrate where it "filed two demurrers, accepted and contested discovery request[s], engaged in efforts to schedule discovery, omitted to mark or assert arbitration in its case management statement"].)

## B. Appellants Substantially Invoked the Litigation Machinery and Respondents Had Substantially Invested in the Lawsuit When Arbitration Was Invoked

The trial court identified substantial evidence that Appellants substantially invoked the litigation machinery and that Respondents had substantially invested in the lawsuit by the time Appellants finally sought to compel arbitration in

15

December 2020.  The court noted that Appellants variously (1) filed a cross-complaint seeking affirmative relief from the court; (2) filed ten motions, including five discovery motions, and five ex parte applications; (3) propounded discovery on the Japanese Investors; (4) noticed depositions; and (5) obtained relief with respect to the lis pendens.  Though the discovery activities did not yield information to Appellants, they did force Respondents to incur substantial costs in responding and preparing for depositions.  Likewise, Respondent Kokubu prepared and filed a motion for summary adjudication.  He did so 11 months after Appellants withdrew their initial demand to arbitrate—a time when Kokubu would have been justified in believing the matter would proceed in court rather than in arbitration.  All in all, the trial court found that the Japanese Investors had collectively incurred more than $300,000 in legal fees litigating their cases in state court as opposed to the arbitral forum.

### C.  Appellants Delayed for a Long Period Before Seeking a Stay

The trial court found that Appellants delayed for a long period before seeking a stay in order to arbitrate.  They brought their arbitration and related motion for stay more than two years after Kokubu filed his lawsuit; sixteen months after withdrawing their initial arbitration demand; and five months after the trial court resolved their lis pendens expungement motion.

Citations in the parties' briefs reflect that how long is "too long" differs according to the circumstances.  While we disagree with Respondents' suggestion that the length of a delay *alone* can render it unreasonable as a matter of law, the delay is often accompanied by costs incurred, changes in strategic advantage,

16

use of disputed property, consumption of the time of parties and counsel, and other impacts that warrant careful consideration of the length of the delay and any justifications for it.  This is not a case where there was delay unaccompanied by litigation activity by the parties.  The over $300,000 in legal fees incurred by Respondents alone reflects the substantial investment in the court process during the lengthy delay in invoking arbitration.  And not just delay, but explicit waiver of arbitration by Appellants.

In *Burton*, *supra*, the court discussed the differing approaches to analyzing the impact of delay taken in *Sobremonte v. Superior Court* (1998) 61 Cal.App.4th 980 (*Sobremonte*) and *Groom v. Health Net* (2000) 82 Cal.App.4th 1189 (*Groom*).  We agree with *Burton* that *Sobremonte* correctly recognized that substantial delay can create prejudice by depriving the parties of speedy and inexpensive dispute resolution, and that *Groom* improperly downplayed this factor.  (*Burton, supra*, 190 Cal.App.4th at pp. 947–949.)

Appellants argue that they "delayed bringing the arbitration motion so that they could get the lis pendens expunged."  But as Respondents point out, Appellants could not explain to the trial court why they waited approximately two years to file a motion to compel arbitration.  During that time, they engaged in court litigation that went far beyond the narrow issue of lis pendens expungement.  They made no effort to actively invoke arbitration proceedings while seeking limited

17

resolution of the lis pendens issue.[6]

Moreover, the lis pendens litigation was resolved in June 2020 but Appellants held their motion to compel until that December.  Appellants concede that the intervening five-month delay "is not attributable to the motions to expunge" but assert it "can be and is explained, in large part, by the COVID-19 pandemic and the resultant uncertainties faced by the Court and all parties and counsel."  This argument is not supported by the record.  Appellants' argument in their reply in the trial court about why they delayed for five months references no declaration or other evidence.  Indeed, the asserted factual basis in the reply (delay due to COVID-19) was different than the factual basis asserted at oral argument (time needed to make a business decision of whether to post bond).

Between the date the trial court granted the expungement motion and the date Appellants filed their motion to compel arbitration, Appellants were active participants in the litigation and readily imposed on the trial court and Respondents when it served their interests.  They variously gave written discovery responses, served discovery requests, served deposition notices, moved to quash a subpoena, moved ex parte to continue the trial date, moved ex parte to continue Respondent Kokubu's MSA, engaged in extensive meet and confer activities, and filed motions to compel discovery responses.  With this context, the suggestion that COVID precluded filing their arbitration motion promptly after resolution of the lis pendens issue lacks evidentiary

---

[6]    The trial court commented, "I have cases—it's not uncommon for people to come in on a lis pendens and also for me to make an order for arbitration.  I mean, that's not unusual."

18

support.

Finally, Appellants seek to shift the blame for their delay on Respondents. It is true that a party subject to an arbitration agreement who files in a judicial forum, or actively litigates in that forum, bears some responsibility for delays attending the court litigation process. However, a defendant who silently acquiesces to the judicial forum notwithstanding its contractual right to compel arbitration quickly comes to share that responsibility. There is a range of reasons that a plaintiff may choose the judicial forum, including innocent mistake, a meritorious argument that the arbitration agreement does not apply, and bad faith. There are also valid and/or tactical reasons a defendant may conclude that the litigation forum is preferable to arbitration in a given case. Appellants clearly made such a tactical decision when they withdrew their arbitration request. A defendant who opposes proceeding in a judicial forum should do so promptly so that the time and resources of the parties and the court are not wasted. (See *Christensen, supra,* 33 Cal.3d at p. 782 ["The defendant may seek a stay, or dismissal, of the action [subject to an arbitration right] [citation], and it is normally desirable that he do so promptly if he intends to do so at all . . ."].) A defendant that fails to act promptly does so at its own peril. If we were to adopt Appellants' reasoning, delay would cease to be a factor in considering a defendant's motion to compel arbitration.

The trial court did not err in finding Appellants unreasonably delayed demanding arbitration.

### D. Appellants Filed a Cross-Complaint Without Pursuing a Stay

Appellants filed a cross-complaint on July 19, 2019, and demanded arbitration the same day. Contrary to their assertions, however, they did not seek a stay of the proceedings. They sought a stay only of the *trustee's sale*—a stay that they contended would give them time to arbitrate—but stopped short of asking the court to stay the case and leave the parties to their chosen arbitral forum. Moreover, Appellants dropped their demand for arbitration shortly after the trustee's sale went forward (and just 18 days after making the demand), but most of the claims in their cross-complaint remain pending to this day.

In the absence of an actual motion to stay, the trial court properly relied on the fact that Appellants filed a cross-complaint in denying their motion to compel arbitration.

### E. Appellants Took Advantage of Judicial Discovery Procedures Not Available in Arbitration

Appellants served extensive discovery requests and noticed depositions. These discovery tools were not available in arbitration under the terms of the MLA 1. Appellants urge that they received no information from Respondents through discovery such that their efforts to obtain discovery should not weigh against them in seeking to compel arbitration.[7] Nevertheless,

---

[7] We acknowledge some cases indicate that a movant's unsuccessful discovery attempts alone do not result in prejudice to the non-movant for the purposes of the waiver analysis. (See, e.g., *Groom, supra,* 82 Cal.App.4th at p. 1196.) We do not read these cases as precluding consideration of such discovery efforts in connection with the other *St. Agnes* factors. We also note that

Appellants forced responses from Respondents to which Appellants would not have been entitled in arbitration. Moreover, "even discovery responses totally devoid of substantive content . . . can reveal volumes about the strength and weakness of a party's case." (*Berman v. Health Net* (2000) 80 Cal.App.4th 1359, 1367, fn. omitted.)

We cannot conclude that the record lacks evidence that Appellants took advantage of judicial discovery procedures unavailable in arbitration. The trial court was therefore entitled to rely on the fact that Appellants sought extensive discovery in denying their motion to compel arbitration.

### F. Appellants' Conduct Prejudiced Respondents

Appellants urge us to limit prejudice to situations where the opposing party has (i) provided information in compliance with civil discovery obligations that do not apply in arbitration; or (ii) "alter[ed] its litigation posture in a fundamentally inalterable or otherwise sticky [*sic*] way . . . ." Cases do not support such a limitation.

In *Burton*, the court explained that "a petitioning party's conduct in stretching out the litigation process itself may cause prejudice by depriving the other party of the advantages of arbitration as an 'expedient, efficient and cost-effective method to resolve disputes.' [Citation.] Arbitration loses much, if not all, of

---

there can be a wide spectrum of facts that may be described as "unsuccessful" discovery, from a single request for a deposition to dozens of motions to compel discovery. (Cf. *Adolph, supra,* 184 Cal.App.4th at pp. 1448-1449, 1451 [unsuccessful discovery efforts by movant supported finding of waiver].) We believe the trial court was in the best position to weigh the relative impact of the discovery that was propounded.

21

its value if undue time and money is lost in the litigation process preceding a last-minute petition to compel." (*Burton*, *supra*, 190 Cal.App.4th at p. 948.) The Supreme Court has acknowledged *Burton* and declined to disclaim its analysis. (*Iskanian*, *supra*, 59 Cal.4th at p. 377.) We will not disclaim it here as the trial court determined that Appellants' delay was unreasonable and unjustified. (*Ibid.*)

Relying on *Burton* and other aligned decisions, the trial court concluded that Appellants had prejudiced respondents by unreasonably delaying their arbitration demand. In the two years that Appellants held their demand, Respondents incurred more than $300,000 in costs. By holding their demand, they also delayed resolution of the case relative to when it might have concluded had they promptly exercised their right to compel arbitration. The trial court observed that Appellants' delay in moving to compel arbitration, among other things, "enabled [Appellants] to retain possession and control of the Property for a longer period of time . . . ." Appellants characterize this as improperly prejudging the merits of the case. However, other courts have considered delayed recovery of a claimed, but disputed, entitlement as contributing to prejudice resulting from a delayed arbitration demand. (See, e.g., *Younan*, *supra*, 49 Cal.App.5th at p. 83.)

## CONCLUSION

We find that the record supports the trial court's conclusion that Appellants waived their right to arbitration. We therefore need not consider whether the trial court erred in finding that the third-party litigation exception also justified its ruling.

22

## DISPOSITION

The order is affirmed.  Respondents are entitled to their costs on appeal.

## CERTIFIED FOR PUBLICATION


HARUTUNIAN, J.[*]

We concur:


GRIMES, Acting P. J.


STRATTON, J.

---

[*]     Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.